**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

**Emmanuel E. Huertas Leon, et al.,**

    Plaintiffs,

        v.

**Idalia Colon-Rondon, et al.,**

    Defendants.

CIVIL NO. 15-1017 (PG)

## OPINION AND ORDER

Defendants Idalia Colon Rondon ("Colon-Rondon"), Rosa Muñoz-Marzan ("Muñoz-Marzan"), and the Family Department for the Commonwealth of Puerto Rico ("Family Department") (or collectively, "Defendants") filed a Motion to Dismiss Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6), or for failure to state a claim upon which relief can be granted (Docket No. 27). Plaintiffs' filed a response in opposition thereto (Docket No. 35). For the reasons explained below, the court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to dismiss.

## I.    BACKGROUND

### *The case, in a nutshell*

Four of the five plaintiffs, Frances Quiñones Fontanez ("Quiñones-Fontanez"), Angel Cortes Maldonado ("Cortes-Maldonado"), Hilda Correa Delgado ("Correa-Delgado"), and Juanita Figueroa Garcia ("Figueroa-Garcia") are disabled elders who were committed to "Hogar Hacienda El Ruiseñor" ("HHER"), an institution or shelter devoted to the care of elders managed by the fifth plaintiff, Emmanuel E. Huertas Leon ("Huertas-Leon") (collectively, "Plaintiffs"). The services provided by HHER to the four disabled Plaintiffs

were financed by the Family Department's "Adult Services Program" (in Spanish, "Programa de Servicios a Adultos") (the "Program").[1]

Between March 27, 2012 and December of 2014, Huertas-Leon allegedly exchanged correspondence with the Trujillo Alto, Carolina Program, as well as the Central Office of the Family Department and its regional director in Carolina, co-defendant Muñoz-Marzan. See Docket No. 29 at 10. Through these exchanges, Huertas-Leon said that the elders' developmental disabilities warranted a modification to the payments that they received as part of the Adult Services Program (the "Program"). See id. In 2013, Huertas-Leon purportedly informed Defendants that behavioral changes seen in one unnamed Program participant required specialized medical services that HHER was unable to provide.

On November 17, 2014, the Family Department revoked HHER's operating license due to its alleged failure to comply with the requisite laws and regulations. See Docket No. 27 (Exh._1). Huertas-Leon appealed this determination before the Family Department's Adjudicative Board (the "Board"). See Docket No. 35 at 17.

On December 6, 2014, Quiñones-Fontanez, Cortes-Maldonado, Correa-Delgado and Figueroa-Garcia, personally or through a family representative, apparently sought protective orders enjoining Defendants from transferring or relocating them to other licensed institutions through ex parte requests filed in state court. The state court judge denied their requests. See Docket No. 29 at 13.

On December 8, 2014, three of those four disabled Plaintiffs were transferred to other licensed homes. Cortes-Maldonado was transferred to Ciudad Dorada, and Correa-Delgado

---

[1] The court will assume that the amended complaint sufficiently alleges that, except for Huertas-Leon, Plaintiffs are qualified individuals within the meaning of the statutes they ground their claims on.

and Figueroa-Garcia were transferred to Hogar Shalom. <u>See id.</u> at 14-15. Defendant Muñoz-Marzan allegedly removed Quiñones-Fontanez from the Program in retaliation for his complaints. <u>Id.</u> at 14. One of the Family Department's social workers, Amanda Roman, intimidated him saying "I will place you in a mission, close you behind bars and you will not see your family or children ever again." <u>Id.</u> Figueroa-Garcia's son, Angel Berrios Figueroa, allegedly received similar threats from Family Department officials warning him that the services would be cancelled if he refused to keep her at Hogar Shalom. <u>See</u> Docket No. 1-3 (incorporated or adopted by reference in the amended complaint).

Plaintiffs Quiñones-Fontanez, Cortes-Maldonado, Correa-Delgado, and Figueroa-Garcia presented claims under Title II of the Americans with Disabilities Act ("ADA" or "Title II"), 42 U.S.C. § 12134 et seq.; Section 504 of the Rehabilitation Act ("Section 504" or "REHAB"), 29 U.S.C. § 794 et seq.; Puerto Rico's Bill of Rights for Persons with Disabilities, P.R. LAWS. ANN. tit. 1, § 512 et seq.; Puerto Rico's Bill of Rights for Elderly Persons, P.R. LAWS ANN. tit. 8, § 341 et seq.; and Articles 1802 and 1803 of Puerto Rico's Civil Code, P.R. LAWS. ANN. tit. 31, §§ 5141 and 5142. <u>See</u> Docket No. 29 at 2. In sum, Plaintiffs allege that Defendants discriminated and retaliated against them by removing them from HHER and transferring them into homes that do not provide the special services required by their incapacities, which were ostensibly taken care of at HHER. They contend that the abrupt termination of their stay at HHER constituted a violation of their due process rights.

Additionally, Huertas-Leon filed suit as director of HHER, alleging he has standing to sue under Title II of ADA, 42 U.S.C. §12203(c); within the meaning of Section 1 of the Puerto Rico Law Prohibiting Discrimination Against Disabled Persons, P.R. LAWS ANN. tit. 1, § 501(c); and a person who conducts a "program or activity," or is an "individual's

representative," pursuant to the Rehab Act claims, 29 U.S.C. §§ 794 and 705(22). <u>See</u> Docket No. 29 at 3. Huertas-Leon claims that Defendants' decision to revoke HHER's operating license constitutes retaliation for having complained with the Family Department. <u>See</u> *supra* at 2.

Based on the allegations summarized above, Plaintiffs request declaratory judgment and preliminary and permanent injunctions prohibiting Defendants from terminating the services provided to the elder and disabled Plaintiffs at HHER, and from enrolling or transferring them to any other institution without their consent. Additionally, they request a "preliminary and permanent injunction enjoining Defendants from denying patients due process, executing service agreements without the elders' or their relatives' consent, and endorsing undesirable missions and shelters with unfit facilities." <u>Id.</u> at 32. Finally, they request compensatory damages of no less than $ 1,000,000 for each individual Plaintiff, as well as costs and attorneys' fees. <u>See id.</u>

### *Recent Developments*

On November 20, 2018, the court ordered Plaintiffs to supplement the record with copy of the final determination issued by the Family Department in the administrative proceeding challenging the revocation of HHER's license. <u>See</u> Docket No. 44. The information was deemed necessary considering that much of Plaintiffs' arguments in opposition to the motion to dismiss hinge on the adequacy of the Family Department's processes and policies (or lack thereof). The court also takes note of their request to be reinstated at HHER "until administrative proceedings are decided by the state proceedings." <u>See</u> Dockets No. 35, 44 and 47.

Plaintiffs informed the court that on January 10, 2019, Huertas-Leon's voluntarily dismissed his appeal before the Department's Adjudicative Board. Again, that appeal challenged administrative decisions and process in connection with the cancellation of HHER's license. See Dockets No. 46 and 51. Plaintiffs explained that "[l]icense renewal was not processed by the Family Department, the shelter became insolvent and was evicted from its premises. Therefore, the owner/licensee notified the appeals body that administrative remedy was moot." Docket No. 51 at 1.

Notably, Plaintiffs also informed that Cortes-Maldonado and Correa-Delgado had passed away. But Plaintiffs have not followed the process set out in Rule 25 of the Federal Rules of Civil Procedure—they never requested substitution of the parties or any other available remedy for that matter. See Fed R. Civ. P. 25. Given the time elapsed since, the court on its own dismisses Cortes-Maldonado's and Correa-Delgado's claims.[2] As a result, only the claims asserted by Huertas-Leon, Quiñones-Fontanez, and Figueroa-Garcia remain.

## II.    STANDARD OF REVIEW

When ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a district court must "accept as true the well-pleaded factual allegations of the complaint, draw all reasonable inferences therefrom in the plaintiff's favor, and determine whether the complaint, so read, limns facts sufficient to justify recovery on any cognizable theory." Rivera v. Centro Medico

---

[2] Rule 25 states that "[i]f a party dies and the claim is not extinguished, the court may order substitution of the proper party. A motion for substitution may be made by any party or by the decedent's successor or representative. If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed." Fed. R. Civ. P. 25(a)(1).

Even if Plaintiffs had substituted Cortes-Maldonado and Correa-Delgado in time, their requests for prospective injunctive relief would nonetheless be dismissed as "a federal court may not grant injunctive relief when, as in this case, intervening events have eliminated any reasonable anticipation that the aggrieved party will, in the future, be faced with a recurrence of the alleged harm." Goodwin v. C.N.J., Inc., 436 F.3d 44, 49 (1st Cir. 2006).

de Turabo, Inc., 575 F.3d 10, 15 (1st Cir. 2009) (citing LaChapelle v. Berkshire Life Ins. Co., 142 F.3d 507, 508 (1st Cir. 1998)). Even though detailed factual allegations are not necessary for a complaint to survive a motion to dismiss, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do [.]" Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). Those nonconclusory factual allegations that the court accepts as true must be sufficient to give the claim facial plausibility. See Quiros v. Munoz, 670 F. Supp. 2d 130, 132 (D.P.R. 2009). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).

When deciding motions to dismiss, the analysis of the courts is not limited solely to the facts alleged in the complaint. See Rederford v. US Airways, Inc., 586 F. Supp. 2d 47, 50 (D.R.I. 2008). A court may consider the complaint alongside any "facts extractable from documentation annexed to or incorporated by reference in the complaint and matters susceptible to judicial notice." Jorge v. Rumsfeld, 404 F.3d 556, 559 (1st Cir. 2005). Furthermore, courts may consider documents that are "integral or explicitly relied upon in a complaint, even if that document is not annexed to the complaint." Id.

### III.    DISCUSSION

As noted before, Defendants moved to dismiss under Rule 12(b)(6), and the court addresses their arguments in turn. However, because the motion does not seek dismissal of every claim asserted by Plaintiffs, outstanding allegations suggesting First and Fourteenth Amendment claims could linger. For efficiency purposes, the court, on its own, evaluates their plausibility under the applicable standard of review.

### A. *Plaintiffs' request for preliminary injunctive relief is not warranted*

Defendants ask for dismissal of Plaintiffs' requests for preliminary injunctive relief. A preliminary injunction is an extraordinary remedy that should be granted carefully and sparingly. See Fed. R. Civ. P. 65. The burden is on the movant to show the following elements: "(1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing an injunction will burden the defendants less than denying an injunction would burden the plaintiffs; and (4) the effect, if any, on the public interest." Gonzalez-Droz v. Gonzalez-Colon, 573 F.3d 75, 79 (1st Cir. 2009) (quoting Boston Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 11 (1st Cir. 2008)).

The first two factors are of particular importance, and "irreparable harm constitutes a necessary threshold showing for an award of preliminary injunctive relief." Id. (quoting Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004)). "To demonstrate the prospect of future harm, a plaintiff must show more than that she has been injured ..., [as] [p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects." Steir v. Girl Scouts of the USA, 383 F.3d 7, 16 (1st Cir. 2004) (alteration in original) (quoting O'Shea v. Littleton, 414 U.S. 488, 495-496 (1974)).

Plaintiffs first request a preliminary injunction enjoining Defendants from removing or terminating services provided at HHER, without prior medical advice or due process, and from enrolling Plaintiffs without their consent (or their families'). See Docket No. 29 at 32. As mentioned before, the pleadings indicate that on November 17, 2014, HHER lost its operating license, and on December 8, 2014, Figueroa-Garcia was transferred to Hogar

Shalom and Quiñones-Fontanez was removed from the Program. <u>See</u> Docket No. 27 (Exh. 1); Docket No. 29 at 14-15. More than four years have passed since Defendants undertook the conduct that Plaintiffs sought to prevent through the first preliminary injunction. The court finds that the relief requested has become moot.

Second, Plaintiffs request a preliminary injunction enjoining Defendants "from denying patients due process, executing service agreements without the elders' or their relatives' consent, and endorsing undesirable missions and shelters with unfit facilities." Docket No. 29 at 32. As previously mentioned, more than four years have passed since Figueroa-Garcia and Quiñones-Fontanez were removed from HHER. An exhaustive review of the pleadings demonstrates that Plaintiffs did not meet their "burden of demonstrating that a denial of interim relief is likely to cause irreparable harm[.]" <u>Charlesbank Equity Fund II</u>, 370 F.3d at 162. Simply put, the circumstances alleged heavily suggest that any "harm" is more likely speculative than actual or imminent. <u>See</u> <u>Winter v. Natural Resource Defense Council, Inc.</u>, 555 U.S. 7, 22 (2008) (holding that "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief").

A reading of the amended complaint does not help their case either, because the facts alleged do not even describe with specificity their individual disabilities and the injuries or harms suffered as a result of Defendants' alleged discrimination because of such disabilities. Because Plaintiffs failed to show a reasonable probability of success on the merits, and for the reasons explained above, Defendants' motion is granted as to Plaintiffs' requests for preliminary injunctive relief.

### B. *Huertas-Leon's standing under ADA and Rehab Act*

Defendants contend that Huertas-Leon does not have standing to seek relief for the disabled Plaintiffs under ADA or Rehab Act. They argue that, normally, parties can only assert their own rights in court unless they indicate that an exception applies. In the present case, Defendants believe that Huertas-Leon has "failed to indicate how an exception applies to his person and he has failed to plead facts sufficient to characterize him as one of the qualified individuals claiming ADA or Rehab Act discrimination." <u>See</u> Docket No. 27 at 12.

In their response, Plaintiffs argue that Huertas-Leon has third-party standing under the aforementioned statutes based on his "association" with the other named Plaintiffs. Specifically, "he was solely in charge of their custody and care, provide [sic] special services and for the administration of their benefits." <u>See</u> Docket No. 35 at 11-12. Plaintiffs are correct because "under both the [Rehab Act] and ADA, non-disabled individuals have standing to bring claims when they are injured because of their association with a disabled person." <u>Santiago Ortiz v. Caparra Center Associates, LLC</u>, 261 F. Supp. 3d 240, 247 (D.P.R. 2016) (quoting <u>McCullum v. Orlando Regional Healthcare System, Inc.</u>, 768 F.3d 1135, 1142 (11th Cir. 2014)).

### *Standing for Discrimination Claims*

The ADA provides that "[i]t shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." <u>Id.</u> at 247 (quoting 42 U.S.C. § 12182(1)(E)).

Plaintiffs allege that the supposedly discriminatory action taken by the Family Department against Huertas-Leon—i.e., the revocation of HHER's operating license—was a retaliatory measure taken in response to the exchanges held between them from March of 2012 to December of 2014.[3] See Docket No. 35 at 13. But Plaintiffs never allege that Defendants revoked HHER's license because of the disabilities of HHER's patients and the facts included in the amended complaint do not support such a theory. Instead, the non-conclusory allegations only allow us to plausibly infer that any adverse action taken against Huertas-Leon, HHER or its disabled elders was the result of Huertas-Leon's own actions, and not because of his association with HHER's patients. The court finds that Huertas-Leon lacks the required standing to raise an ADA or Rehab Act discrimination claim, and Defendants' motion to dismiss his discrimination claim is, therefore, GRANTED.

### *Standing for Retaliation Claims*

On the other hand, Plaintiffs correctly argue that § 12203 of the ADA does not require that Huertas-Leon be a "qualified individual" to bring a retaliation claim. Their position is founded on the plain language of the statute, which "protects 'any individual' who has opposed any act or practice made unlawful by the ADA or who has made a charge under the ADA." See Docket No. 35 at 12 (quoting Krouse v. American Sterilizer Co., 126 F.3d 494, 502 (3rd Cir. 1997)).

Title II indeed defines retaliation as a discriminatory action taken against an individual "because such individual has opposed an act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in

---

[3] As an alternate theory of recovery, Plaintiffs' response brief states that Huertas-Leon's political affiliation motivated Defendants' actions. But for the reasons explained in Section E of this Opinion and Order, the court rejects Plaintiffs' careless attempt to raise such a claim.

an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). Section 504 also grants standing to victims of retaliation when or because they assist disabled individuals in vindicating their rights. See Weber v. Cranston School Committee, 212 F.3d 41, 49 (1st Cir. 2000) (holding that Congress did not limit the remedial provision of the Rehab Act to those claims brought by or on behalf of disabled individuals "in apparent recognition of the fact that disabled individuals may need assistance in vindicating their rights from individuals who may have their own claim to relief under the Act").

Given these provisions, and the well-pleaded facts stated thus far, Huertas-Leon has standing to sue for retaliation even though he is not a "qualified individual" under Title II or Section 504. Because Plaintiffs also allege that Defendants' decision to revoke HHER's license constituted a retaliatory act taken in response to Huertas-Leon's complaints, the court finds that Huertas-Leon clears the standing hurdle as to the retaliation claims.[4] Defendants' motion to dismiss on this basis is DENIED.

*C.  Title II and Section 504 Claims*

Although the ADA and Rehab Act have some differences, "the First Circuit has recognized that in some cases their 'points of departure have no bearing.'" Vazquez v. Municipality of Juncos, 756 F. Supp. 2d 154, 163 (D.P.R. 2010) (quoting Partelow v. Massachusetts, 442 F. Supp. 2d 41, 47 (D. Mass. 2006)). Consequently, "the courts in our circuit have found that a separate analysis of [Section] 504 claims is not necessary when an ADA claim on the same grounds is being considered." Id. See also Parker v. Universidad de P.R., 225 F.3d 1, 4 (1st Cir. 2000) (citing 29 U.S.C. § 794(a) and 42 U.S.C. § 12132) (noting that "[i]n applying Title

---

[4] As a result, the court does not address Defendants' remaining arguments regarding Huertas-Leon's standing.

II ... we rely interchangeably on decisional law applying § 504"); <u>Tveter v. Derry Cooperative School District SAU #10</u>, Case No. 16-cv-329-PB, 2017 WL 2062944, at *5-6 (D.N.H. Apr. 25, 2017). Unless otherwise noted, the court thus examines the claims under both statues without further distinction.

    *a) Discrimination*

    Title II, which addresses discrimination by governmental entities, specifically provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 provides similar anti-discrimination protections for disabled individuals in connection with any program that receives federal funds. <u>See</u> 29 U.S.C. § 794(a).[5]

    The First Circuit has recognized three types of discrimination claims that can be brought under Title II. <u>See</u>, <u>e.g.</u>, <u>Nunes v. Massachusetts Department of Correction</u>, 766 F.3d 136, 144-145 (1st Cir. 2014). First, a plaintiff can assert that his or her disability motivated the disparate treatment or adverse action taken by the defendant. Second, that a governmental policy, albeit seemingly neutral, effectively impacts one group more than another on account of their disabilities, and this discrepant effect cannot be justified by business necessity. Finally, a plaintiff can claim that a public entity refused to affirmatively accommodate his or her disability and the requested accommodation was needed to provide "meaningful access to a public service." <u>Id.</u> at 144 (quoting <u>Henrietta D. v. Bloomberg</u>, 331 F.3d 261, 273-76 (2d

---

[5] Section 504 specifically states that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a).

Cir. 2003)). Under ADA, the request for accommodation need not take on a specific form or language. See Kelley v. Mayhew, 973 F. Supp. 2d 31, 39 (D. Me. 2013).

A plaintiff claiming discrimination under Title II must allege that he or she (1) is a qualified individual with a disability; (2) was either excluded from participation in or denied the benefits of services, programs, or activities provided by a public entity or was otherwise discriminated against; and (3) such exclusion was by reason of his or her disability. See Vazquez, 756 F. Supp. 2d at 162-63. The question that this court must ask is "not whether the benefits to persons with disabilities and to others are actually equal, but whether those with disabilities are as a practical matter able to access benefits to which they are legally entitled." Buchanan ex rel. Estate of Buchanan v. Maine, 366 F. Supp. 2d 169, 176 (D. Me. 2005) (quoting Henrietta, 331 F.3d at 273).

Defendants contend that Plaintiffs failed to state a *prima facie* case of discrimination because any violation to Title II (or Section 504, for that matter) must be motivated by "either discriminatory animus or ill will *due to disability*." Docket No. 27 at 15. They also argue that Plaintiffs failed to address how their disabilities factored in Defendants' decision to transfer or relocate them. They contend that there was a perfectly legitimate, non-discriminatory reason for the removal of the qualified Plaintiffs from HHER, to wit, the shelter lost its license for lack of compliance with the applicable laws and regulations. Id. Moreover, Defendants argue that "merely alleging that the new substitute homes have 'deficiencies' as compared to the services and facilities in HHER is not in and itself a violation of the ADA." Id.

In their response, Plaintiffs assert that a finding of discriminatory animus or ill will due to disability is not necessary in order to state a plausible discrimination claim under Title II

and Section 504. <u>See</u> Docket No. 35. They explain their claims can succeed "based on allegations that a public entity has refused to affirmatively accommodate his or her disability where such accommodation was needed to provide meaningful access to a public service." <u>Id.</u> at 21. As Plaintiffs point out, the allegation that the elders faced discrimination based on the inadequate conditions and services provided at the substitute shelters is at "the very core" of their complaint. <u>Id.</u> The court now examines the plausibility of the allegations in support of each of their claims.

<u>Figueroa-Garcia</u>

According to the amended complaint, Figueroa-Garcia is a qualified individual who has been kept in Hogar Shalom since December 8, 2014, where she is being held "in unjustified isolation and segregation without qualified personnel to meet her medical and physical needs." Docket No. 29 at 15. Hogar Shalom allegedly does not "afford proper accommodations to accomplish their service plan and prevent the program recipients the opportunity to participate in or benefit from the services that their conditions require, and which were adequately and customarily provided for at [HHER]." <u>Id.</u> at 15-16. A sworn declaration by Figueroa-Garcia's son, Angel Berrios Figueroa, explains that he complained about the inadequate services that his mother was receiving, and the Family Department responded with threats that the services granted to Figueroa-Garcia would be cancelled if he refused to keep her at Hogar Shalom. <u>See</u> Docket No. 1-3 (adopted by reference in Plaintiffs' amended complaint at Docket No. 29).

Defendants do not challenge that Figueroa-Garcia is a person with a disability or that the Family Department is a public entity. Thus, the court's inquiry focuses on determining whether the amended complaint plausibly alleges that Figueroa-Garcia was denied the

benefits of the Family Department's services, programs, or activities or was otherwise discriminated against by reason of her disability. See Gray v. Cummings, 917 F.3d 1, 15 (1st Cir. 2019) (quoting Buchanan, 469 F.3d at 170-71)). The amended complaint's factual allegations, when taken as true and read in the light most favorable to Plaintiffs' claims, do not warrant that conclusion.

There are no specific allegations concerning Figueroa-Garcia for the court to plausibly infer that the challenged actions or decisions and the inadequate treatment or services Hogar Shalom provides her are motivated, even slightly, by her disability. She does not allege that the Family Department's policies affect her more than others on account of her disability. Figueroa-Garcia also fails to allege that she requested a reasonable accommodation from the Family Department (other than returning to an unlicensed establishment) that was then denied. Although a request for reasonable accommodation generally does not require any specific form or language, the First Circuit has held that:

> In cases where the alleged violation involves the denial of a reasonable modification/accommodation, "the ADA's reasonable accommodation requirement usually does not apply unless 'triggered by a request.'" This is because a person's "disability and concomitant need for accommodation are not always known ... until the [person] requests an accommodation. However, "sometimes the [person]'s need for an accommodation will be obvious; and in such cases, different rules may apply.

Kiman v. New Hampshire Dept. of Corrections, 451 F.3d 274, 283 (1st Cir. 2006) (footnote omitted) (citations omitted) (quoting Reed v. LePage Bakeries, Inc., 244 F.3d 254, 261 & n. 7 (1st Cir. 2001)).

Again, Figueroa-Garcia has not alleged that she requested an accommodation, or that her need for it was obvious to Defendants so as to trigger different rules. Because Figueroa-Garcia has failed to state sufficient facts satisfying the elements of an ADA discrimination

claim, Defendants' motion is GRANTED, and her claim is DISMISSED WITHOUT PREJUDICE.

### *b)  Retaliation*

For Plaintiffs' retaliation claims to go forward, they must allege that they (i) undertook protected conduct, (ii) suffered an adverse action, and (iii) the two were casually linked. See Colon-Fontanez v. Municipality of San Juan, 671 F. Supp. 2d 300, 331 (D.P.R. 2009).[6] Protected conduct under Title II of the ADA "includes 'affirmative action in advocating for, or protesting discrimination related to, unlawful conduct by others'" DeCotiis v. Whittemore, 842 F. Supp. 2d 354, 369 (D. Me. 2012) (quoting Montanye v. Wissahickon Sch. Dist., 218 Fed. Appx. 126, 131 (3rd Cir. 2007)).

### Huertas-Leon

The amended complaint includes a retaliation claim as to Huertas-Leon. In support, Plaintiffs allege that Huertas-Leon undertook conduct protected when he complained about matters related to the Program administered by the Family Department. They also aver that Huertas-Leon requested services necessary to meet the disabled elders' needs and to accomplish the purposes of the Establishment for the Elderly Act, P.R. LAWS. ANN. tit. 8, § 351 et seq., and its regulations. Third, Huertas-Leon allegedly suffered an adverse action when the Family Department revoked HHER's operating license on November 17, 2014. Although Defendants vehemently contest Plaintiffs' allegations that HHER's license was

---

[6] The court is aware that Colon-Fontanez is a summary judgment opinion, and thus, the discussion of the evidentiary standard for evaluating the retaliation claims differs from the pleading standard applied at our present stage.

revoked as retaliation for Huertas-Leon's complaints, the standard of review at the motion to dismiss stage favors the non-conclusory facts alleged in the amended complaint.

Assessing the causal connection element is somewhat frustrated by Plaintiffs' murky allegations as to the timeline of the events in question. Specifically, Plaintiffs claim that Huertas-Leon exchanged correspondence (presumably, complaints) with the Family Department "[b]etween March 27, 2012 and December [of] 2014." Docket No. 29 at 10. However, in their response to Defendants' motion to dismiss, Plaintiffs state that HHER obtained its operating license on November 30, 2012, eight months after Huertas-Leon allegedly began to complain. See Docket No. 35 at 13. Furthermore, HHER's license was apparently revoked on November 17, 2014, yet Huertas-Leon continued undertaking purportedly protected conduct after this date. See Dockets No. 27 and 29.

Despite the confusing and at times contradictory statements made by Plaintiffs, the court recognizes that "for pleading purposes, [they] need not *establish* this element; the facts contained in the complaint need only show that the claim of causation is plausible." Rodriguez-Reyes v. Molina-Rodriguez, 711 F.3d 49, 56 (1st Cir. 2013). Because their amended complaint alleges sufficient facts to render the element of causation plausible, Huertas-Leon's retaliation claims under the ADA and Rehab Act survives dismissal—at least for now. Consequently, Defendants' motion to dismiss those claims is hereby DENIED.

### Quiñones-Fontanez

Plaintiffs claim that the Defendants retaliated against Quiñones-Fontanez when they removed him from the program due to "his opposition to a replacement mission imposed by force and without his consent," as well has his "exercise or enjoyment of his right to free speech and the right to select a health and shelter provider." Docket No. 29 at 22. The

amended complaint further alleges that Quiñones-Fontanez objected to being removed or transferred from HHER, something that occurred on December 8, 2014. By then, more than three weeks had passed since HHER had lost its license. Significantly, Puerto Rico's Establishment of the Elderly Act makes it a misdemeanor to operate a substitute shelter for qualified adults without a license.[7] Assuming that Quiñones-Fontanez engaged in protected conduct by demanding to remain at HHER or opposing his relocation to any alternate *licensed* shelter, then he left Defendants with two choices: either let him stay at a shelter without an operating permit, and thus incur in criminal conduct, or relocate the patient.

Even taking the few factual allegations at face value, the court is hard-pressed to find that there is a plausible retaliation claim. To the contrary, the facts alleged by Plaintiff merely suggest that Quiñones-Fontanez actively proposed and requested that Defendants violate the law by letting him stay at an establishment that had no license to continue operating, thus putting Defendants between a rock and a hard place. Such conduct is hardly the kind that these statutes seek to protect. Consequently, the court will DISMISS his retaliation claim WITHOUT PREJUDICE.

In sum, the court GRANTS Defendants' motion to dismiss Figueroa-Garcia's discrimination claim and Quiñones-Fontanez's retaliation claim. The dismissal is without

---

[7] Said statute provides that:

> [a]ny person or entity that operates or maintains an establishment for care of the elderly without a license issued by the Department, or that continues to operate it after its license has been canceled, suspended, or denied pursuant to the procedures provided in this chapter, shall be guilty of a misdemeanor and upon conviction, shall be punished by a fine of not less than five hundred dollars ($500) nor greater than two thousand dollars ($2,000), or by imprisonment for a term of not more than six months, or both penalties at the discretion of the court.

P.R. LAWS. ANN. tit. 8, § 363(a).

prejudice. However, the court DENIES Defendants' motion to dismiss Huertas-Leon's retaliation claim.

### D. Compensatory Damages under Title II and Section 504

Each Plaintiff requests $1,000,000 in compensatory damages. Defendants request dismissal on the grounds that such damages are not available under Title II or Section 504.

Compensatory damages are generally available under both statutes. See Vazquez, 756 F. Supp. 2d at 167. However, "the ADA is not a wholesale substitute for common-law personal-injury torts. Individuals can recover money damages under the ADA only if they prove intentional discrimination by the defendant." LeClair v. Massachusetts Bay Transportation Authority, 300 F. Supp. 3d 318, 325 (D. Mass. 2018). The First Circuit has further held that "under Title II non-economic damages are only available when there is evidence 'of economic harm or animus towards the disabled.'" Carmona-Rivera v. Puerto Rico, 464 F.3d 14, 17 (1st Cir. 2006) (quoting Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 126-127 (1st Cir. 2003)). Discriminatory animus "requires a showing that defendant intended to discriminate against plaintiff based on his disability." LeClair, 300 F. Supp. 3d at 326.[8] Under the Rehab Act, too, intentional discrimination is a required component of a compensatory damages award. See Panzardi-Santiago v. University of Puerto Rico, 200 F. Supp. 2d 1, 20-21 (D.P.R. 2002); Guckenberg v. Boston University, 974 F. Supp. 106, 153 (D. Mass. 1997) (further noting that "good faith attempts to pursue legitimate ends are not sufficient to support an award of compensatory damages under Section 504").

---

[8] Again, the court is mindful that we are still at the pleading stage and refuses to hold Plaintiffs' amended complaint to specialized or heightened pleading requirements. Some of the cases cited in this Opinion and Order discussing similar claims at the summary judgment stage or under stricter, evidentiary standards merely lend guidance to the court's analysis of the law.

In the amended complaint, Plaintiffs allege that the Family Department's decision to revoke HHER's license, and the subsequent transfer of the elders living there, was a retaliatory act taken in response to Huertas-Leon's complaints. Plaintiffs' response indicates for the first time that the challenged actions could have been politically motivated. See Docket No. 35 at 13. Indeed, Plaintiffs' theory regarding Huertas-Leon's ADA and Rehab Act claims is premised on Defendants' retaliatory intent or their personal animosity towards Huertas-Leon, but not on the disabilities of qualified individuals. In other words, the facts alleged by Plaintiffs allow the court to infer that the consequences suffered by Quiñones-Fontanez and Figueroa-Garcia were unfortunate hardships of the disputes between Huertas-Leon and Defendants. At no point have Plaintiffs alleged that the elders' disabilities were, in any way, the motivating factor in Defendants' decision to revoke HHER's license and subsequently transfer them to new shelters.

In sum, the amended complaint lacks factual allegations suggesting Defendants' actions were motivated by a desire to intentionally discriminate against the disabled elders that Huertas-Leon claims association with. Because they fail to allege sufficient facts that would render the discriminatory intent element plausible, the motion to dismiss compensatory damages requests under Title II and Section 504 is **GRANTED**. The dismissal is without prejudice.

### E. Plaintiffs' First Amendment Claims[9]

In their response to Defendants' motion, Plaintiffs insinuate for the first time that Defendants' retaliatory actions were politically motivated. See Docket No. 35 at 13.

---

[9] Although Defendants have not moved for dismissal of the First Amendment claims, the court will evaluate their plausibility anyway.

Specifically, they aver that in February of 2013—approximately two months after HHER obtained the operating license and shortly after a change in Puerto Rico's government—the Family Department began a "program of harassment," which culminated in HHER's closure. Id. 13-14. Plaintiffs' perfunctory mention of the parties' politics boils down to this: "Muñoz Marzan is also a political activist, unsuccessful candidate for major in the town of Trujillo Alto and antagonist to Mr. [Huertas-Leon], a political contender." Id. at 13.

"Factual allegations made for the first time in a responsive memorandum are not properly considered in evaluating the sufficiency of a complaint under Rule 12(b)(6)." Winne v. Nat'l Collegiate Student Loan Tr. 2005-1, No. 1:16-cv-00229-JDL, 2017 WL 3573813, at *6 (D. Me. Aug. 17, 2017) (citing Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1107 (7th Cir. 1984)). See also Ortiz v. Jimenez-Sanchez, 98 F. Supp. 3d 357, 365 n. 5 (D.P.R. 2015) (rejecting factual allegations and claims made for the first time in plaintiffs' opposition to defendants' motion to dismiss); Klein v. MHM Corr. Servs., Inc., C.A. No. 08–11814-MLW, 2010 WL 3245291, at *2 (D. Mass. Aug. 16, 2010) (factual allegations presented for the first time in opposition to a motion to dismiss must be disregarded).

Plaintiffs' amended complaint does not contain a single allegation with which to support a claim of discrimination or retaliation against any of them on the basis of Huertas-Leon's political affiliation. As such, the court rejects their attempt to introduce new claims by way of a response or opposition to a motion under Rule 12(b)(6). And even if the court were to side-step this procedural road block, the facts alleged in the response are still legally insufficient to state a claim and show entitlement to relief because of political

discrimination. Either way, and for the reasons the court continues to explain below, we wind up with dismissal of any implausible First Amendment claims.[10]

Now, the amended complaint hints a First Amendment claim based on Plaintiffs' exercise of their free speech rights. As noted earlier, the non-conclusory facts alleged are that Huertas-Leon wrote to or complained with the Family Department about reductions in subvention payments; modifications in the "entitlement" received by the program participants to accomplish the purpose of the program; and information regarding specialized medical services, which were needed by some of the elders living at HHER. See Docket No. 29 at 10.[11] The amended complaint also states that on December 6, 2014, some of the Plaintiffs sought *ex parte* protective orders against the Department objecting their relocation and requesting to be reinstated at HHER. Id. On December 8, 2014, the elders were removed to other missions or shelters with allegedly unsuitable facilities that are unequipped or otherwise unable to provide the services needed by Plaintiffs. Defendants supposedly executed the removals or relocations without following the adequate procedure

---

[10] The court further notes that throughout the course of this litigation, Plaintiffs amended their complaint once and have not requested leave for subsequent amendments since.

[11] Plaintiffs' amended complaint is replete with terminology that makes it difficult to understand what exactly occurred (or what was supposed to occur). See, e.g., Docket No. 29 at ¶¶ 10-14 & 27-30 (using words and phrases like "involuntary commitment," "without medical consent," and "special and protective services" without previous explanation or context; and implying distinctions between "public grant," "subvention payments," "monthly payments," and Social Security income or benefits used to "pay special services"); id. ¶ 37 (referring to "developmental disabilities" that "required a modification in the entitlement provided to the program recipients..." without further factual content, such as correlation between elder and their particular disability); id. ¶ 42 (using "due process" and due process legal jargon such as "prior notice" and "opportunity to be heard," together with terms like "surprise terminations" and "service agreements" executed with other "providers" to allege systemic violations of the ADA). Plaintiffs' response to Defendants' motion to dismiss is similarly flawed and, to make matters worse, it includes more than 500 pages of attachments, the relevance of which is not self-evident or much explained in the body of the response. See Dockets No. 35 & 39. As a result, discerning the factual and legal theories that underlie each of Plaintiffs' claims has been challenging to say the least. The court reminds Plaintiffs that "[j]udges are not mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." Echevarría v. AstraZeneca Pharmaceutical LP, 856 F.3d 119, 139 (1st Cir. 2017) (quoting United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)).

(e.g., providing prior notice and obtaining consent). Id. at 14-16. Plaintiffs maintain that Defendants acted with impermissible, discriminatory and retaliatory motive against the elders and Huertas-Leon because the latter encouraged the former to complain or aided them in so doing.

At the outset, the court reads Plaintiffs' scattered references to "free speech" as allegations supporting a retaliation claim under the ADA or the Rehab Act for having engaged in statutorily protected conduct, and not as a claim under the First Amendment. Generally, to plead First Amendment retaliation, Plaintiffs must allege that "(1) '[their] conduct was constitutionally protected' and (2) 'the protected conduct was a substantial or motivating factor driving the alleged retaliatory decision.'" Pollard v. Georgetown Sch. Dist., 132 F. Supp. 3d 208, 226 (D. Mass. 2015) (quoting Hannon v. Beard, 979 F. Supp. 2d 136, 140 (D. Mass. 2013)).

The court readily assumes Huertas-Leon was a government contractor who spoke about subjects of public interest in his "exchanges" or complaints to the Family Department between March of 2012 to December of 2014.[12] See Rosaura Bldg. Corp. v. Municipality of Mayaguez, 778 F.3d 55, 62–63 (1st Cir. 2015) (citing Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr, 518 U.S. 668, 116 S. Ct. 2342 (1996)) (explaining that under Supreme Court precedent, the similarities between independent contractors and employees are so obvious that it is appropriate to follow the precedents that protect government employees from retaliation for their public discourse). As such, his claim is subject to the analysis established in Pickering v. Board of Education of Township High School District 205, 391 U.S. 563, 88

---

[12] Huertas-Leon self-identified as such in his response to Defendants' motion to dismiss. See Docket No. 35 at 17 (stating that "Mr. Huertas is a contractor receiving or received federal funds to operate Hogar Hacienda el Ruiseñor.")

S. Ct. 1731 (1968). The three elements under consideration are: (1) whether the plaintiff spoke as a citizen on a matter of public concern, (2) whether the relevant government entity had an adequate justification for treating the plaintiff differently from any other member of the general public, and (3) whether the plaintiff can show that the protected expression was a substantial or motivating factor in the adverse decision. See Barton v. Clancy, 632 F.3d 9, 27 (1st Cir. 2011) (quoting Curran v. Cousins, 509 F.3d 36, 45 (1st Cir. 2007)).

The court need not tarry, as the amended complaint fails to allege that Huertas-Leon spoke as a citizen, period. Rather, taking the allegations at face value, the court finds that Huertas-Leon's purported "protected speech" constituted communications or complaints pursuant to or in furtherance of his contractual relationship with the Family Department. See Docket No. 29 at 5-9. Having failed to allege the necessary elements of an actionable First Amendment retaliation claim, the court DISMISSES the same WITHOUT PREJUDICE.

Now, as to the allegations concerning the elder Plaintiffs' exercise of their rights to "free speech," the court finds them insufficient to plausibly establish a claim for which relief could be granted. While the court harbors no doubt that a governmental actor's retaliatory actions against individuals who exercise constitutionally protected First Amendment rights are cognizable claims under federal law (i.e., 42 U.S.C. § 1983), in this case, the amended complaint states that Plaintiffs voiced their objections and oppositions to their removal from HHER and relocation to other shelters after the fact. Thus, the adverse actions taken by Defendants preceded the protected conduct in question.

The complaint's allegations concerning the ex parte requests for protective orders are similarly flawed. Plaintiffs' assertion that the state court judge "declined to issue summons

against the Defendant Family Department and declined to take any action at all..." (Docket No. 29 at 13) defeats any plausible inference that Defendants had knowledge of the protected conduct or speech, and thus, that Plaintiffs' exercise thereof and Defendants' actions were casually linked. Consequently, their First Amendment claims are also DISMISSED WITHOUT PREJUDICE.

### F. *Whether Eleven Amendment Immunity protects Defendants from Plaintiffs' Section 504 claims*

Section 504 prohibits disability discrimination in "any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a). Adopting a literal interpretation of Section 504, Defendants argue that the Plaintiffs' Section 504 claims fail because the Adult Services Program was not directly financed with federal funds. See Docket No. 27 at 14. Since the Adult Services Program is not federally funded, Defendants further contend that the Family Department did not waive its Eleventh Amendment immunity against Rehab Act suits that stem from the program in question.[13] The court disagrees.

Defendants' erroneous interpretation of Section 504 fails, not least because the applicable case law makes it abundantly clear that states or its instrumentalities waive their sovereign immunity against such claims whenever they accept federal funds, regardless of whether any specific service or program was financed using them. See Diaz-Fonseca v. Puerto Rico, 451 F.3d 13, 33 (1st Cir. 2006) (holding that the Commonwealth of Puerto Rico does "not have Eleventh Amendment immunity against the federal IDEA and Rehabilitation Act claims, because they waived such immunity by accepting federal funds"); Nieves-

---

[13] The Eleventh Amendment states that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.

Marquez, 353 F.3d at 129 (holding that "Puerto Rico has clearly waived its Eleventh Amendment immunity under § 504"); Orria-Medina v. Metropolitan Bus Authority, 565 F. Supp. 2d 285, 300 (D.P.R. 2007) (holding that the Department of Transportation and Public Works' acceptance of federal funds operates as a waiver of Eleventh Amendment from Rehab Act claims) (citing 42 U.S.C. § 2000d-7(a)(1)).

Defendants do not dispute Plaintiffs' contention that, at all relevant times, the Family Department received federal funds. As a result, Eleventh Amendment immunity does not protect Defendants from Plaintiffs' Section 504 claims, and their motion to dismiss on this ground is DENIED.

G.  *Whether Eleventh Amendment immunity protects Defendants against Plaintiffs' Due Process Claims*

The government of Puerto Rico and its instrumentalities can be sued if they consent to by statute, or if Congress has expressly waived their Eleventh Amendment immunity. See Collazo-Perez v. Puerto Rico, 100 F. Supp. 3d 88, 93 (D.P.R. 2015). If Eleventh Amendment immunity applies, it "bars the recovery of damages in a federal court against the Commonwealth of Puerto Rico ... and, by the same token, it bars the recovery of damages in *official capacity* suits brought against Puerto Rico officials where recovery will come from the public fisc." Id. (quoting Culebras Enter. Corp. v. Rivera Ríos, 813 F.2d 506, 516 (1st Cir. 1987)). However, "the Eleventh Amendment's proscription does not extend to suits seeking prospective injunctive relief against state officials for constitutional violations." Guzman-Vargas v. Calderon, 672 F. Supp. 2d 273, 295-96 (D.P.R. 2009).

Defendants argue that Eleventh Amendment sovereign immunity bars Plaintiffs' Due Process claims. They contend that Puerto Rico is considered a "state" for Eleventh

Amendment purposes, and immunity extends to arms or "alter egos" of the state. <u>See</u> <u>Toledo-Colon v. Puerto Rico</u>, 812 F. Supp. 2d 110, 118 (D.P.R. 2011) (also recognizing that "the Eleventh Amendment protects a state official from suits against him or her in his or her official capacity"). <u>See</u> Docket No. 29 at 24-25. Plaintiffs' counter that sovereign immunity doctrine does not shield Defendants from their ADA and Rehab Act claims. <u>See</u> Docket No. 35 at 22-24. This argument is inapposite and fails to defeat Defendants' claim for sovereign immunity.

Plaintiffs' problems worsen because the amended complaint fails to indicate the specific statute, federal or otherwise, pursuant to which they seek relief for the alleged due process violations. But it is clear by now that Plaintiffs cannot recover monetary damages from official capacity Defendants. <u>See</u> <u>Replay, Inc. v. Secretary of Treasury of Puerto Rico</u>, 778 F. Supp. 2d 207, 213-214 (D.P.R. 2011) (holding that "albeit it is well settled that the Eleventh Amendment bars suits for monetary damages against a state and its officers, it does not preclude claims for prospective equitable relief").

Now, Plaintiffs might still be able to claim prospective injunctive and declaratory relief against Defendants if there are sufficient factual allegations to render their due process claims plausible. After an exhaustive reading of Plaintiffs' cluttered allegations, which were hard to decipher to say the least, the court believes that Huertas-Leon, Figueroa-Garcia, and Quiñones-Fontanez are claiming violations to their procedural due process rights. These claims will be analyzed separately.

First, Huertas-Leon claims that Defendants violated his procedural due process rights by revoking HHER's operating license without providing "adequate notice and an opportunity for a hearing." Docket No. 29 at 25. To establish a procedural due process claim, a plaintiff

must sufficiently allege that "he has a property interest as defined by state law and ... that Defendants, acting under color of state law, deprived him of that property interest without a constitutionally adequate process." See Replay, 778 F. Supp. 2d at 216.

One of the basic guarantees of procedural due process is that "before a significant deprivation of liberty or property takes place at the state's hands, the affected individual must be forewarned and afforded an opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Gonzalez-Droz v. Gonzalez-Colon, 660 F.3d 1, 13 (1st Cir. 2011) (quoting Amsden v. Moran, 904 F.2d 748, 753 (1st Cir. 1990)). However, it is well settled law that sometimes a post-deprivation hearing satisfies due process. See Zinermon, 494 U.S. at 128. Whether a pre-deprivation hearing is due is mainly determined by balancing three factors: (1) the private and public interests involved; (2) the inherent risk in the procedures employed by the state that could result in an erroneous deprivation of Plaintiffs' property interest; and (3) the likely benefits that might be gained from additional procedural protections. See Mathews v. Eldridge, 424 U.S. 319, 335 (1976). This analysis focuses on the process and not its result— "[w]hether the deprivation was, in fact, justified is not an element of the procedural due process inquiry." Gonzalez-Droz, 660 F.3d at 13.

Under Puerto Rico law, and the Department's regulations, an appeal contesting the revocation or cancellation of a shelter's license to operate must be brought before the Family Department's Board. See, e.g., Regulation Num. 7349, § 21.4.[14] The Department indeed notified Huertas-Leon of the revocation of HHER's operating license, as well as his right to

---

[14] The Family Department's Regulation No. 7349 ("Regulation for the Licensing and Supervision of Establishments for the Elderly"), as amended, establishes the licensing requirements that shelters dedicated to the care of elderly persons such as HHER must meet to operate. See Regulation No. 7349, § 2.2. Under the same, licensed shelters must be able to adequately respond to the biopsychosocial needs of the elderly persons protected under Puerto Rico law.

appeal that decision. <u>See</u> Docket No. 32. The letter containing the notification listed the shelter's purported infractions to the Department's regulations, as identified by the Department's officers between February of 2013 and October of 2014, as well as the consequences of Huertas-Leon's failure to correct them.[15] That notification also informed that the Department's decision would not become final until conclusion of appeal proceedings. <u>See</u> Docket No. 35 at 14 (stating that "the exhibits of the Defendants clearly demonstrate that the action is not final").

As such, the Family Department's letter sent to Huertas-Leon satisfied the adequate notice requirement of procedural due process. <u>See</u> <u>Haidak v. University of Massachusetts at Amherst</u>, 299 F. Supp. 3d 242, 262 (D. Mass. 2018) (quoting <u>Goss v. Lopez</u>, 419 U.S. 565, 582 (1975)) (explaining how "[r]easonably adequate notice must at a minimum inform the affected party of 'what he is accused of doing and what the basis of the accusation is'"). On the other hand, the court cannot evaluate whether the post-deprivation hearing provided by Regulation Num. 7349 satisfies procedural due process because, as the following discussion showcases, Huertas-Leon failed to exhaust that remedy.

---

[15] Under the Rule 12(b)(6) standard, the court may only consider facts and documents that are part of or incorporated into the complaint; if documents outside of the pleadings are considered, the motion should be adjudicated under the more stringent standards of a Rule 56 motion for summary judgment. <u>See</u> <u>Rivera v. Centro Medico de Turabo, Inc.</u>, 575 F.3d 10, 15 (1st Cir. 2009). The First Circuit has carved out exceptions to this rule for documents the authenticity of which are not disputed by the parties; for official public records; for documents that are central to plaintiff's claim; or for documents sufficiently referred to in the complaint. <u>See</u> <u>id.</u> The court may also augment the complaint's well-pleaded facts with facts susceptible to judicial notice. <u>See</u> <u>Rodriguez-Ramos v. Hernandez-Gregorat</u>, 685 F.3d 34, 37 (1st Cir. 2012) (supplementing the well-pleaded facts found in the complaint with reference to Puerto Rico statutes and facts susceptible to judicial notice in order to place the allegations in context).

The amended complaint in this case incorporates evidence, and the letter sent by the Family Department is heavily cited by Plaintiffs themselves. The authenticity of this document is, therefore, not disputed (even if Plaintiffs' disagree with the contents thereof). Thus, it is not necessary to convert Defendants' motion to dismiss into a motion for summary judgment.

Plaintiffs' exhaustion of administrative remedies offered by state law is a relevant factor to consider when ascertaining the plausibility of their procedural due process claims. See Zinermon v. Burch, 494 U.S. 113, 125 (1990). Exhaustion of those remedies is important here because the deprivation of a protected interest is not, by itself, unconstitutional--only the deprivation of a property interest "*without due process of law*" is. Olympic Automotive & Accessories v. Puerto Rico Electric Power Authority, 68 F. Supp. 3d 300, 306 (D.P.R. 2014). Therefore, a procedural due process claim "is not complete when the deprivation occurs; it is not complete *unless and until* the state fails to provide due process." Id. (quoting Zinermon, 494 U.S. at 125-126). In order to give Plaintiffs' due process, the Family Department was required to safeguard the procedures and remedies available under Puerto Rico law. Id.

Significantly, the exhaustion of administrative remedies doctrine "provides that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." Id. (quoting McKart v. United States, 395 U.S. 185, 193 (1969)). Said requirement serves a useful purpose, as it seeks to "avoid premature interruption of the administrative process because it is generally inefficient to permit a party to seek judicial recourse without first exhausting the administrative remedies." Id. As such, a plaintiff claiming that his or her procedural due process rights have been violated must have exhausted all available avenues of administrative review, "**regardless of the particular relief offered (or not offered) through a given set of administrative procedures.**" Id. (emphasis added) (citation omitted).

Plaintiffs admitted that Huertas-Leon appealed the revocation of HHER's license on due process grounds to the Family Department Adjudicative Board. See Docket No. 35 at 14. On

January 26, 2019, Plaintiffs informed the court that Huertas-Leon voluntarily dismissed his administrative appeal on January 10, 2019, because the "administrative remedy was moot." Docket No. 51 at 1. Therefore, Huertas-Leon failed to avail himself of adequate administrative remedies available under Puerto Rico law. And in so doing, he failed to place the court in a position to evaluate if those procedures and remedies satisfy due process guarantees contained in the U.S. Constitution. Huertas-Leon's reason for his voluntary dismissal of the administrative appeal, to wit, that the remedy offered by said forum had become moot, is not an adequate justification for his failures. See Olympic Automotive & Associates, 68 F. Supp. 3d at 307, 309 (citations omitted) (holding that "exhaustion is mandatory, which means that a party *must* exhaust all available avenues of administrative review 'regardless of the particular relief offered (or not offered) through a given set of administrative procedures'").[16] As a result, Huertas-Leon has not pled "sufficiently excusatory circumstances to warrant the spurning of that remedy [provided by the state]." Id. at 309 (quoting Portela-Gonzalez v. Secretary of the Navy, 109 F.3d 74, 80 (1st Cir. 1997)).

Plaintiffs' amended complaint also lacks any allegation that would suggest that "full exhaustion would have caused undue prejudice, irreparable harm, or unusual hardship." Id. In sum, Huertas-Leon cannot complain that the state violated his procedural due process rights when he actively refused to avail himself of those procedures that he claims to be unconstitutional.

---

[16] The court also takes notice that the administrative remedy that has become moot—the reopening of HHER—is the exact same prospective injunctive relief that is being requested through Huertas-Leon's procedural due process claim.

Figueroa-Garcia alleges that she has a legitimate entitlement to the payments that she receives as a part of the Family Department's "Adult Services Program," which are used to pay the services provided by licensed shelters. See Docket No. 29 at 8. Figueroa-Garcia also avers that Defendants violated her procedural due process rights by transferring her from HHER to Hogar Shalom. See Docket No. 29 at 25. However, the fact that Figueroa-Garcia has a legitimate entitlement to keep receiving payments as part of a government program does not mean that she has a constitutional or statutory right to elect to use those funds at HHER and nowhere else. The procedural component of the due process guarantee does not protect everything that might be perceived as a "benefit." See Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748, 756 (2005) (quoting Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972)) (holding that "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire' and 'more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it").

Even after a very liberal reading of the complaint, the court cannot conclude or infer that Defendants deprived Figueroa-Garcia of a protected property interest without due process. Again, the non-conclusory facts alleged are that HHER lost its license to operate, which necessarily ended this Plaintiff's stint at the shelter. More importantly, if she was transferred to Hogar Shalom, then she *kept receiving payments* that she is purportedly entitled to. Because Figueroa-Garcia failed to plausibly allege a due process claim, the court DISMISSES such claim WITHOUT PREJUDICE.

Finally, in support of a procedural due process claim, Quiñones-Fontanez alleges that he was terminated from the Adult Services Program without prior notice and opportunity to be heard. See Docket No. 29 at 25. Like Figueroa-Garcia, Quiñones-Fontanez adequately

alleges a legitimate entitlement to the monthly payments received as a part of the Program. See id. at 9. Unlike Figueroa-Garcia, however, Quiñones-Fontanez alleges he was deprived of the entitlement when Defendants unilaterally and "abruptly dumped" him from the Program on December 8, 2014. See id. at 14. If he stopped receiving the payments altogether, and Defendants did not give him prior notice or an opportunity to be heard on the matter, then sufficient facts have been alleged to establish a plausible procedural due process claim. Nevertheless, his recourse is limited to injunctive or declaratory relief. As such, his request for monetary relief on this claim cannot proceed.

Based on the above, the court GRANTS Defendants' motion to dismiss Huertas-Leon's and Figueroa-Garcia's procedural due process claims but DENIES the motion as to Quiñones-Fontanez's claim. Again, his recourse will be limited to prospective injunctive and declaratory relief arising.

## H. Whether sovereign immunity also protects Defendants from Plaintiffs' Puerto Rico law claims

Defendants argue that Plaintiffs' claims for damages pursuant to Puerto Rico's Bill of Rights for Persons with Disabilities, Bill of Rights for Elderly Persons, and Articles 1802 and 1803 of Puerto Rico's Civil Code are barred by the Eleventh Amendment. Defendants' assertions are correct as a matter of law. First, a reading of the Bill of Rights for Persons with Disabilities "does not suggest that the Commonwealth consented or intended to consent to being sued in the federal forum for alleged violations of such statutes." Orria-Medina, 565 F. Supp. 2d at 317.[17] The same conclusion can be reached upon reading the Bill of Rights for

---

[17] Section 512j of the Bill of Rights for Persons with Disabilities states that:

> [i]t shall be the duty of the Office of the Advocate for Persons with Disabilities to oversee faithful compliance with the provisions set forth in this chapter.

Elderly Persons.[18]  Second, although it is true that the Commonwealth of Puerto Rico "has consented to be sued for damages in actions brought under the Commonwealth general negligence statute, such consent does not extend to actions filed in any courts but the Commonwealth's own." Diaz-Fonseca, 451 F.3d at 33. And neither Article 1802 nor 1803 of Puerto Rico's Civil Code contains an explicit waiver of the state's Eleventh Amendment immunity at the federal level. See id.

The Family Department, as an instrumentality of the Commonwealth of Puerto Rico, possesses sovereign immunity barring all claims of compensation under the Puerto Rico Bill of Rights for Persons with Disabilities, the Bill of Rights for Elderly Persons, and Articles 1802 and 1803. Plaintiffs concede that Defendants "Idalia Colon Rondon [and] Rosa Muñoz Marzan ... were performing within their official capacities at all times relevant hereto." Docket No. 29 at 29. Because the Eleventh Amendment protects state officials from suits against them in their official capacities, Plaintiffs' claims for damages pursuant to Puerto Rico's law against Defendants fail as a matter of law. See Municipality of San Sebastian v. Puerto Rico, 116 F. Supp. 3d 49, 54 (D.P.R. 2015) (quoting Rosie D. ex rel. John D. v. Swift,

---

> Any person, natural or juridical, public or private who does not comply with the provisions of this chapter shall be subject to the penalties set forth in subsection (a) of § 532q of Title 3, part of the act also known as the 'Office of the Advocate for Persons with Disabilities Act.

P.R. LAWS. ANN. tit. 1, § 512j.

[18] The Puerto Rico Bill of Rights for Elderly Person states that:

> [a]ll elderly persons, on their own, or by their tutor, or through a public official, police officer or private person concerned for their welfare, may go, before the Unit to Investigate and Prosecute Civil Rights Violations of the Department of Justice, or before the Office of the District Attorney of the Judicial Center closest to their residence, or before any part of the Court of First Instance of the judicial district where they reside, to claim any right or benefit enacted in this chapter or to request the suspension of any action which contravenes its provisions. The district attorneys and the courts shall grant priority to the actions brought by virtue of this section[.]

P.R. LAWS ANN. tit. 8, § 346.

310 F.3d 230, 234 (1st Cir. 2002)) (pointing out that "[g]enerally speaking, the Eleventh Amendment 'bars suits in federal courts against unconsenting states,' as well as 'official capacity suits against state hierarchs'").

Thus, Defendants' motion to dismiss Plaintiffs' claims for damages pursuant to Puerto Rico's Bill of Rights for Persons with Disabilities, the Bill of Rights for Elderly Persons, and Articles 1802 and 1803 of Puerto Rico's Civil Code is GRANTED, and the claims DISMISSED WITH PREJUDICE.

## IV.    CONCLUSION

Based on the above, the court **GRANTS** Defendants' motion to dismiss Cortes-Maldonado's and Correa-Delgado's claims, although for the reasons stated in Section I of this Opinion. The court **GRANTS** Defendants' motion to dismiss Plaintiffs' requests for preliminary injunctions, as they fail to allege sufficient facts justifying the granting of such extraordinary relief.

While the court **DENIES** Defendants' motion to dismiss Huertas-Leon's claim of retaliation under ADA and Rehab Act, it **GRANTS** their motion to dismiss his request for compensatory damages under said statutes. Per Plaintiffs' record admissions, the request for injunctive relief to reopen HHER is now moot. As such, only Huertas-Leon's request for declaratory judgment under ADA and Rehab Act remains. See Docket No. 51 at 1. The court also **GRANTS** Defendants' motion to dismiss Figueroa-Garcia's discrimination claims pursuant to Title II and Section 504, as well as Quiñones-Fontanez's retaliation claims under Title II and Section 504.

The court **GRANTS** Defendants' motion to dismiss Huertas-Leon and Figueroa-Garcia's claims arising from the Due Process clauses of the Constitution of the United States and the

Constitution of Puerto Rico. The court likewise **GRANTS** Defendants' motion to dismiss Quiñones-Fontanez's request for monetary relief arising from his own procedural due process claims. However, the court **DENIES** Defendants' motion to dismiss Quiñones-Fontanez's requests for prospective injunctive and declaratory relief arising from those claims.

Finally, the court **GRANTS** Defendants' motion to dismiss all claims arising from the Puerto Rico Bill of Rights for Persons with Disabilities, the Bill of Rights for Elderly Persons, and articles 1802 and 1803 of Puerto Rico's Civil Code.

**IT IS SO ORDERED**.

In San Juan, Puerto Rico, March 31, 2019.

S/ JUAN M. PÉREZ-GIMÉNEZ
**JUAN M. PEREZ-GIMENEZ**
**SENIOR U.S. DISTRICT JUDGE**